**STATE of Iowa, Appellee,**

v.

**John Lee WASHBURNE, Appellant.**

No. 96–905.

Supreme Court of Iowa.

Dec. 24, 1997.

Rehearing Denied March 9, 1998.

Barry M. Anderson, Keokuk, for appellant.

Thomas J. Miller, Attorney General, Richard J. Bennett, Assistant Attorney General, Michael P. Short, County Attorney, and Bruce C. McDonald, Assistant County Attorney, for appellee.

Considered by HARRIS, P.J., and NEUMAN, SNELL, ANDREASEN, and TERNUS, JJ.

ANDREASEN, Justice.

John L. Washburne was found guilty of murder in the first degree, in violation of Iowa Code section 707.2 (1995). On appeal, Washburne argues the trial court erred in denying his pretrial motion to suppress (1) statements made by him to law enforcement officials, (2) evidence gained after he allegedly consented to the seizure of his tennis shoes, (3) statements made by him after he had invoked his constitutional rights, and (4) statements made by him during the telephone calls that were recorded while he was in jail. We affirm.

I. *Background Facts and Proceedings.*

On July 14, 1995, at approximately 7:30 p.m., the body of Karen Owen was found in

the Des Moines river in a remote area of Keokuk, Iowa. Owen died as a result of severe injuries to her head inflicted by a blunt instrument. She had been beaten to death close to the river's edge and her body dragged to the river and dumped into the water.

The evening before her body was discovered, Owen had been with Bobby Hooper and Washburne at a tavern. Law enforcement officials interviewed both Hooper and Washburne on July 15. On July 16 a search warrant was obtained to search the residences of Hooper and Washburne and to obtain samples of their blood.

On July 17 Washburne reported to the sheriff of Hancock County at Carthage, Illinois, to begin serving a sentence for an unrelated theft conviction. Iowa law enforcement officials continued questioning Washburne by telephone and in person. On July 24 law enforcement officials seized Washburne's tennis shoes and other personal property from Hancock County jail personnel. Interrogation of Washburne continued until he was charged with murder on August 9.

After entering a plea of not guilty to the charge Washburne filed a motion to suppress, which he later amended. The State filed a resistance to both the original motion and its amendment.

A hearing involving part of the original motion to suppress and part of the amended motion was held on February 1, 1996 before Judge D.B. Hendrickson. The issues presented at the hearing related to suppression of items seized pursuant to a search warrant and the suppression of recorded statements made by Washburne over the telephone while he was in the Illinois jail. On February 2, the judge denied Washburne's motion to suppress.

A hearing on the remainder of the motion to suppress was held on March 12, 13, and 19 before Judge R. David Fahey. On March 26 the judge denied the motion to suppress. The same day jury trial against Washburne commenced.

On April 11, the charge was submitted to the jury. The jury returned a verdict of guilty the following day. Washburne re-

quested to be sentenced immediately and the court entered a judgment of conviction on April 12. Washburne filed a timely notice of appeal.

## II. *Scope of Review.*

■ Because Washburne has alleged a denial of his constitutional rights, our review is de novo. *State v. Beeson,* 569 N.W.2d 107, 109 (Iowa 1997).

## III. *Appellate Review of Suppression Rulings.*

■ All issues raised in this appeal arise from the denial of the defendant's pretrial motion to suppress evidence. Our rules of criminal procedure provide for the filing of pretrial motions including motions to suppress. Iowa Rs.Crim. P. 10(2), 11(1). Here, Washburne strenuously argues the trial court should have suppressed the testimony of Iowa Department of Criminal Investigation (DCI) agent Hedlund as to statements made by the defendant to him and all evidence of blood found on his tennis shoes seized without a search warrant.

Hedlund did not testify at the suppression hearing. The State advised the court that Hedlund was in Atlanta, Georgia at a school he was required to attend. At trial, Hedlund testified as to inculpatory statements and admissions made by Washburne, the attending circumstances of those statements, and Washburne's consent to seizure of his tennis shoes.

Washburne urges the State failed to present evidence at the suppression hearing that statements made to Hedlund were voluntary and that the State failed to present evidence of his voluntary consent to the seizure of his tennis shoes. The State contends trial evidence may be considered in support of the trial court's denial of the suppression motion.

Federal appellate courts have held that they may consider evidence first produced at trial to support a trial court's denial of a motion to suppress. *United States v. Han,* 74 F.3d 537, 539 (4th Cir.1996) ("[F]ederal courts have held uniformly that an appellate tribunal may consider evidence adduced at trial that supports the district judge's rul-

ing."); *United States v. Villabona–Garnica,* 63 F.3d 1051, 1056 (11th Cir.1995) ("[W]e may consider any evidence presented at the trial of the case and are not limited to the evidence introduced at the hearing on the motion."); *United States v. Rico,* 51 F.3d 495, 504 (5th Cir.1995) ("[W]e may consider not only the evidence from the suppression hearing but also evidence presented during the trial."); *United States v. Martin,* 982 F.2d 1236, 1240 n. 2 (8th Cir.1993); *United States v. Corral,* 970 F.2d 719, 723 (10th Cir.1992) ("As a reviewing court, we are not confined simply to the evidence adduced during the suppression hearing. In evaluating the correctness of the district court's rulings, the appellate court may consider the entire record developed from the trial even though such evidence may not have been presented during the suppression hearing."); *United States v. Vargas,* 633 F.2d 891, 895 n. 6 (1st Cir.1980) ("It apparently is settled law that the validity of an arrest or search can be *supported* by evidence that was adduced at trial even though this was not presented at the pretrial suppression hearing."); *Rocha v. United States,* 387 F.2d 1019, 1021 (9th Cir. 1967) ("In determining whether a district court erred in admitting evidence claimed to have been seized as a·result of an unreasonable search, an appellate court will not ordinarily limit itself to the testimony received at a pretrial motion to suppress, but will also consider pertinent testimony given at the trial.").

The federal courts generally refer to *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543, 555 (1925), in support of appellate court consideration of facts adduced at trial. In *Carroll,* evidence produced at trial was used to affirm the lower court's refusal to exclude liquor as evidence. The Court stated:

> If the evidence given on the trial was sufficient, as we think it was, to sustain the introduction of the liquor as evidence, it is immaterial that there was an inadequacy of evidence when application was made for its return. A conviction on adequate and admissible evidence should not be set aside on such a ground. The whole matter was gone into at the trial, so no right of the defendants was infringed.

*Carroll,* 267 U.S. at 162, 45 S.Ct. at 288, 69 L.Ed. at 555. The Seventh Circuit in *United States v. Longmire,* 761 F.2d 411, 418 (7th Cir.1985), stated:

> This rule [that evidence adduced only at trial may be used to sustain the denial of a motion to suppress] is an attractive one; because a defendant is entitled to have evidence suppressed only if it was unconstitutionally obtained, sustaining the denial of the motion on the basis of proof of constitutionality adduced at trial avoids a windfall reversal of the defendant's conviction.

Relying on federal authorities, we stated "[i]n determining whether the court erred in overruling the motion to suppress we may consider not only the evidence adduced in the motion to suppress but the later trial testimony." *State v. Donnell,* 239 N.W.2d 575, 577–78 (Iowa 1976). We continue to follow this rule. *State v. Countryman,* 572 N.W.2d 553, 561 (Iowa 1997); *State v. Adams,* 554 N.W.2d 686, 689 (Iowa 1996); *State v. Jackson,* 542 N.W.2d 842, 844 (Iowa 1996); *State v. Cook,* 530 N.W.2d 728, 731 (Iowa 1995); *State v. Vincik,* 436 N.W.2d 350, 353 (Iowa 1989); *State v. Schubert,* 346 N.W.2d 30, 33 (Iowa 1984); *State v. Brown,* 253 N.W.2d 601, 603 (Iowa 1977). As recently stated, "[i]t is one of the facts of court life that a pretrial motion in limine is of limited value unless it is sustained." *State v. Brown,* 569 N.W.2d 113, 118 (Iowa 1997). We have considered evidence received at trial in support of the court's denial of a motion to suppress where there is a challenge to the legality of a custodial statement, *see Schubert,* 346 N.W.2d at 33, and a challenge to the legality of the search and seizure of physical evidence, *see Vincik,* 436 N.W.2d at 353.

## IV. *Statements to Law Enforcement Officials.*

Circumstantial evidence established Washburne's presence at the murder scene. Owen's blood was found on Washburne's tennis shoe. The interviews of Washburne initially suggested he had little knowledge of the events prior to the murder. As more evidence was gathered by law enforcement

officials, Washburne provided information in an attempt to build a case against Hooper. He admitted he picked up Hooper and Owen at a bar and dropped Owen off at her home. He later admitted to transporting them to the crime scene. After stating Hooper had killed the victim, Washburne later said he tried to hit Hooper with a baseball bat but missed and hit Owen.

A. Washburne requested the court to suppress all statements he made to law enforcement officials. He argues the statements were not voluntary and were secured in violation of his constitutional rights. The statements were a result of interviews that occurred between July 15 and August 9. Washburne contends the use of these statements violated his rights under the Fifth and Fourteenth Amendments to the United States Constitution. *See Miranda v. Arizona*, 384 U.S. 436, 467, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694, 714 (1966).

█ The State has the burden to prove by a preponderance of the evidence that Washburne's waiver of his constitutional rights was knowingly, voluntarily, and intelligently given and that the inculpatory statements were made voluntarily. *State v. Vincik*, 398 N.W.2d 788, 789 (Iowa 1987). An express written waiver alone is not enough to establish waiver. *Id.* We have held "[s]tatements are voluntary if they were the product of an essentially free and unconstrained choice, made by the defendant whose will was not overborne or whose capacity for self-determination was not critically impaired." *State v. Payton*, 481 N.W.2d 325, 328 (Iowa 1992).

█ B. The first interview with Washburne began shortly before midnight on July 15 when he came to the Keokuk police station to speak with an officer about the homicide. DCI agent Mower, who did not know Washburne, spoke to him. After taking a break to compare Washburne's information with that of others who had been interviewed, Mower read Washburne his *Miranda* rights. During the interview, Mower and Washburne visited different areas of Keokuk tracing Washburne's travels on the evening of July 13 and the early hours of the 14th. On the evening of July 16, Washburne re-turned to the police station to talk to Mower. Mower again read Washburne his *Miranda* rights and Washburne acknowledged he understood his rights and waived them. During this interview, Washburne told Mower he was required to report to the Hancock County jail in Carthage, Illinois the next day and asked if he could talk to Mower before going there. Mower was not sure he would be able to see him before he left for Illinois, but told Washburne he would come to Carthage later that week.

On July 17, Washburne reported to the Hancock County jail and began serving his jail sentence for theft. Mower went to the jail to talk to him on July 20 at about 2:30 p.m. Mower again orally advised Washburne of his *Miranda* rights and Washburne acknowledged he understood them and agreed to waive them. This interview continued for approximately one and one-half hours. At that time, Mower told Washburne he did not believe him. Washburne then said he had nothing else to say and Mower ceased asking questions. When Washburne asked if Mower thought he needed a lawyer, Mower told him he could not advise him. Mower left the jail and he did not participate in any other interviews with Washburne. Mower testified at both the suppression hearing and the trial.

Keokuk Police Captain Dobson first interviewed Washburne regarding the homicide on July 20. The interview took place in the Hancock County sheriff's office and began about midnight and concluded at approximately 2:00 a.m. on the 21st. Dobson had been advised that Washburne had requested to speak to officer Gull of the Keokuk police department. Because Gull was not involved in the investigation, Dobson notified a deputy of the Hancock County sheriff's department that if Washburne wanted to talk to someone, he was available. After the deputy talked with Washburne, he advised Dobson that Washburne would speak to him. Dobson contacted Hedlund and reported Washburne's request. Both Dobson and Hedlund then traveled to the Hancock County jail.

When they arrived, Dobson, using a written form from the Keokuk police department,

advised Washburne of his *Miranda* rights. Washburne acknowledged that he understood his rights and wished to talk to the officers and signed the form. The interview lasted approximately two and one-half hours. Both Dobson and Hedlund asked Washburne questions. Dobson, who had known Washburne before the homicide investigation, testified at the suppression hearing as to the circumstances surrounding the interview, Washburne's demeanor, and his physical and emotional condition.

On July 24, Dobson and Hedlund again went to the Hancock County jail at Washburne's request. This interview lasted one hour and twenty-five minutes. Dobson testified as to the circumstances and his observations of Washburne.

On August 3 Dobson and Hedlund conducted two interviews with Washburne in the Hancock County sheriff's office. Again Washburne was advised of his *Miranda* rights and he consented to the interview and signed the form. At that time, Washburne told Dobson that he, Washburne, had been advised by his attorney that he should not talk about the case, but he still wanted to discuss it with Dobson and Hedlund. Additional interviews were conducted on August 4 and 9. Dobson testified that he administered the *Miranda* warning before each interview with Washburne, and that Washburne understood his rights and agreed to waive them. The written reports as to the conversations with Dobson were offered and received as evidence in the suppression hearing. Dobson also testified at trial.

Dobson received collect calls from Washburne that were recorded by Hancock County jail officials and received as evidence at the suppression hearing. These telephone conversations took place on July 26, August 3, 9, and 10.

Hedlund testified at trial about the interviews he and Dobson conducted on July 20, 24, August 3 and 4. He also testified as to the circumstances, Washburne's demeanor, and his ability to comprehend and answer questions.

C. Washburne offered evidence at the suppression hearing and at trial to show he was incapable of voluntarily waiving his *Miranda* rights or voluntarily participating in interviews with law enforcement officials. Washburne was examined and treated for complaints of anxiety and hallucinations on August 4. The doctor who examined Washburne saw no evidence of psychosis. His assessment was that Washburne was experiencing short-term stress and depression. After Washburne was charged with murder, at his request, he was examined by a psychologist, Dr. Shepard, Ph.D., and a psychiatrist, Dr. Varner, M.D. At the State's request, Washburne was examined and tested by a psychiatrist, Dr. Taylor, M.D.

Dr. Varner testified that, because of Washburne's mental condition at the time he was in the Hancock County jail, he did not have the mental capacity to effectively waive his constitutional rights or to make any knowing and voluntary statements to law enforcement officials. Washburne had involuntarily ingested methamphetamine on June 22 or 23, 1995, and as a result suffered from hallucinations. In Dr. Varner's opinion, the ingestion of methamphetamine in June had caused hallucinations and episodes of panic disorder. Between June 23 and August 14, Washburne continued to experience flashback and perception disorders. Based on his review of the taped telephone conversation of August 3, it was Dr. Varner's opinion that Washburne was extraordinarily anxious and probably was experiencing a panic attack at the time.

In contrast, Dr. Taylor testified he did not find any indication of hallucinatory experiences during Washburne's interviews with law enforcement officials or during his examination of him. Additionally, Washburne denied he experienced panic attacks during the time he was being interrogated. Dr. Taylor testified the ingestion of methamphetamine on June 22 or 23 would have had no effect after a few days if no additional drugs were taken. Washburne assured Dr. Taylor he had not used any street drugs since June 23. In Dr. Taylor's opinion, Washburne was experiencing anxiety and depression that would not have a debilitating effect on Washburne's ability to appreciate and understand his *Mi-*

*randa* rights or his ability to make voluntary statements or decisions.

We consider a number of different factors in making our evaluation of the voluntariness of a statement. *State v. Smith*, 546 N.W.2d 916, 926 (Iowa 1996). In our consideration of the factors set forth in *Smith*, we find from the evidence Washburne was twenty years old at the time of the interviews. He had prior experience with law enforcement. He was not intoxicated or under the influence of drugs at the time of the interviews. He was provided *Miranda* warnings. He possessed average or above-average intellectual capacity. The officers did not act in a deceptive manner and Washburne appeared to understand and respond to questions. The interviews were spread over a twenty-five-day period. His reactions to the interviews were normal. Washburne was not subject to physical punishment or deprivation of food or sleep. Although Washburne was experiencing anxiety and depression, his emotional condition did not deprive him of his capacity for self-determination. We conclude the State met its burden to show that Washburne's waivers of his *Miranda* rights were knowing, voluntary, and intelligent, and that Washburne's incriminating statements were voluntary.

## V. *Rights to Silence and Legal Counsel.*

 Washburne urges his right to remain silent was not honored. Once a suspect has invoked his or her right to remain silent, further questioning cannot occur unless the suspect initiates the contact. *State v. Newsom*, 414 N.W.2d 354, 357 (Iowa 1987). Mower stopped the July 20 interview when Washburne indicated he did not wish to answer more questions. Questioning that occurred after July 20 was initiated by Washburne. The investigating officers honored Washburne's right to remain silent.

 Washburne claimed he was not provided legal counsel when it was requested. At the end of the July 20 interview, Washburne asked Mower if Mower thought he needed a lawyer. Mower responded that he could not advise Washburne on that issue. Merely asking whether counsel is needed is not sufficient to invoke the right to counsel

and the protections provided by such an invocation. *State v. Morgan*, 559 N.W.2d 603, 608 (Iowa 1997); *State v. Johnson*, 318 N.W.2d 417, 430–31 (Iowa 1982). Washburne's constitutional rights to remain silent and to be provided legal counsel were not violated.

## VI. *Seizure of Tennis Shoes.*

 Washburne challenges the seizure of his tennis shoes while he was in the Illinois jail. The Fourth Amendment to the United States Constitution protects against "unreasonable searches and seizures." U.S. Const. amend. IV. Fourth Amendment protections are applicable against the state. *State v. Thomas*, 540 N.W.2d 658, 662 (Iowa 1995). The seizure of the shoes was accomplished without a warrant. While it is true that a seizure made without a warrant is per se unreasonable, consent negates the unreasonable aspect of the search. *State v. Manna*, 534 N.W.2d 642, 644 (Iowa 1995).

On July 24, a consent form was read to Washburne and he consented to the seizure of his tennis shoes both orally and in writing. Dobson testified at the suppression hearing that during the interview Washburne was not restrained, he understood the questions asked, he responded coherently to the questions, and did not appear to be under the influence of any drugs. At trial, Dobson testified Washburne had authorized the seizure of his tennis shoes that were in the property locker of the Hancock County jail. The written consent was signed by Washburne and witnessed by Dobson. Hedlund testified at trial that Washburne had been advised of his rights, had acknowledged he understood them, and had waived them. His testimony about Washburne's consent to seize his tennis shoes reinforced the testimony of Dobson. On our de novo review we find Washburne gave a valid consent for the seizure of his tennis shoes and that the seizure was constitutional.

## VII. *Taped Telephone Calls.*

Washburne contends the trial court should have suppressed the statements recorded by prison officials while he was in the Hancock

268

County jail. Washburne objects on the basis that Iowa Code chapter 808B prohibits unlawful interception of communications. Chapter 808B is not helpful to Washburne for various reasons. First, section 808B.2(2)(b) does not apply where one of the parties to the communication has given prior consent to its interception. Washburne signed a form at the Hancock County jail authorizing the monitoring of his telephone calls except for those to or from his attorney. Second, as explained in *State v. Fox*, 493 N.W.2d 829, 831 (Iowa 1992), it is clear that Iowa law permits prison officials acting in the ordinary course of their duties to monitor communications of prison inmates. Additionally, chapter 808B does not apply to jail personnel and facilities in other states.

**AFFIRMED.**